GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street, 10th Floor
New York, New York 10004
(646) 964-9640
Jason L. Solotaroff
Amy Robinson
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

CHEVAL SMITH,

      Plaintiff,          **COMPLAINT**

  -against-              Dkt. No.

CABRINI OF WESTCHESTER INC.,

      Defendant.

------------------------------------------------------------------------X

Plaintiff Cheval Smith, by her attorneys Giskan Solotaroff & Anderson LLP, for her complaint against Defendant Cabrini of Westchester Inc. alleges as follows:

### PRELIMINARY STATEMENT

1. This is an action for unlawful retaliation in violation of the False Claims Act, 31 U.S.C. § 3729(h), the New York State False Claims Act, N.Y. Fin. L.§ 191, and N.Y. Labor Law § 741.

2. Ms. Smith worked as a Nurse Manager at Cabrini of Westchester, ("Cabrini") Defendant's nursing home in Dobbs Ferry, New York, from March 2018 until her termination on April 16, 2020. During her employment, Ms. Smith complained about and opposed several unlawful or unsafe practices at the nursing home. She was threatened with termination if she

continued to complain about short-staffing, a practice which endangered patients' wellbeing. Shortly thereafter, Ms. Smith was terminated.

3. The unlawful and/or unsafe practices about which Ms. Smith complained included:

   a. Scheming to defraud the Medicare and Medicaid programs by submitting claims for reimbursement for nebulization procedures that falsely represented that Registered Nurses were performing the procedures, as required by applicable regulations, when in fact Licensed Practice Nurses were performing the procedures in violation of those regulations;

   b. During the COVID-19 crisis, failing to adequately protect the safety and health of the patients and staff, which resulted in spread of the virus through the facility and the deaths of multiple residents;

   c. Failing to adequately care for Medicare patients by deferring on medical decisions to ArchCare, a Medicare HMO Special Needs Plan. ArchCare was financially incentivized to keep its insured patients at the nursing home instead of moving them to the hospital and as a result failed to approve hospital transfers even when hospitalization was medically necessary. As a result, patients did not receive adequate care which resulted in several patient deaths. In addition, the ArchCare Nurse Practitioner who was supposed to care for ArchCare patients at the nursing home inappropriately prescribed Hydroxychloroquine to COVID-19 patients.

4. Ms. Smith was criticized for raising these complaints and was ultimately terminated in retaliation for the complaints on April 16, 2020.

## THE PARTIES

5. Plaintiff Smith is a Black woman of Jamaican national origin who is domiciled in Connecticut.

6. Defendant Cabrini of Westchester Inc. is a not-for-profit corporation organized under the laws of New York with its principal place of business in Dobbs Ferry, New York.

## VENUE AND JURISDICTION

7. This Court has jurisdiction over Ms. Smith's federal False Claims Act claim pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over Ms. Smith's claims under the New York False Claims Act and the New York Labor Law pursuant to 28 U.S.C. § 1367.

8. Venue is properly before this Court pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim occurred in this District.

9. This Court has personal jurisdiction over Defendant because it operates its business in New York State and employed Plaintiff within New York State.

## FACTS

10. Ms. Smith received a Bachelor of Science in Nursing degree from St. Vincent's College and has worked as a Registered Nurse since 2010, predominately in nursing homes.

11. Ms. Smith first began working as a part-time Nurse Manager at Cabrini of Westchester in March of 2018 and was hired on a full-time basis in July of 2018.

**Ms. Smith Objects to Cabrini's Fraudulent Submission
of Nebulization Claims to Medicare and Medicaid.**

12. Many of Cabrini's patients receive benefits from Medicare or Medicaid.

13. Many of the Medicare and Medicaid patients require regular nebulization treatments in which medication is administered through a nebulizer.

14. In order for nebulization to be reimbursed by Medicare or Medicaid, the procedure must be performed by a medical professional within that professional's scope of practice. It was not within the scope of practice of the Licensed Practical Nurses ("LPNs") employed at Cabrini to perform nebulization procedures. It was, however, within the scope of practice for Registered Nurses ("RNs"), like Ms. Smith and the other Nurse Managers, to perform the nebulization procedures.

15. The staffing levels and work assignments at Cabrini did not permit Ms. Smith and the other Nurse Managers to perform the nebulization procedures. Instead, the nebulization procedures were performed by the LPNs. However, Wynona Josephs, Cabrini's Director of Nursing, required the Nurse Managers to fill out paperwork representing that the Nurse Managers had performed them. That paperwork was then used to submit claims to Medicare and Medicaid for reimbursement.

16. Ms. Smith was first asked to falsely certify that she had performed a nebulization soon after she began working full-time at Cabrini in 2018. Ms. Smith initially refused, saying she believed it was illegal to do so, but was told that she would have to make these false certifications in order to keep her job.

17. Ms. Smith continued to be reluctant to sign the nebulization paperwork and was disciplined for failing to sign the paperwork shortly before her termination. When Ms. Josephs terminated Ms. Smith's employment on April 16, 2020, Ms. Josephs specifically mentioned Ms. Smith's failure to sign the nebulization paperwork as a factor in the termination.

**Ms. Smith Objects to Cabrini's Failure to Take Appropriate Steps to Protect Patients and Staff From COVID-19.**

18. After the onset of the COVID-19 pandemic, Ms. Smith repeatedly complained about Cabrini's multiple failures to take appropriate measures to protect its staff and patients.

19. Lack of adequate staffing had long been a problem at Cabrini. Instead of having two LPNs per unit, Cabrini frequently assigned one LPN to each unit and would then assign an additional LPN to float between two units on a single shift. Even in normal circumstances, this was extremely problematic as frequently there would not be enough staff for the patients to receive required medication, such as insulin.

20. Failing to have adequate staff violates New York State laws and regulations which require nursing homes to provide adequate care to patients. Ms. Smith regularly complained to Ms. Josephs about how the lack of staff was endangering patients.

21. After the onset of the COVID-19 public health crisis, however, this "floating" arrangement became even more dangerous. When the floating LPN moved back and forth between multiple units on a single shift, the LPN likely spread the COVID-19 disease from unit to unit. Ms. Smith specifically complained to Ms. Josephs about how the nursing home's practice was endangering patients.

22. Equally seriously, Cabrini failed to require its staff to change personal protective equipment ("PPE") between patient interactions and failed to provide sufficient PPE to allow them to do so. As a result, Cabrini's staff exposed patients to COVID-19. Ms. Smith objected to Cabrini's practices strenuously and made requests on a daily basis for sufficient PPE to permit staff to properly change PPE between patients. Cabrini, however, failed to distribute enough PPE even though Ms. Smith observed a great deal of PPE kept in Cabrini's storerooms.

23. Ms. Smith also requested that Cabrini stop using re-useable trays which would be taken in and out of the rooms of COVID-19 infected patients, thereby spreading the virus. Instead, Ms. Smith requested that disposable trays be used. Cabrini failed to make this change which was consistent with proper infectious disease control practices.

**Ms. Smith Objects to Cabrini Failing to Secure Appropriate Care for ArchCare Patients.**

24. ArchCare is the healthcare subsidiary of the Catholic Archdiocese of New York.

25. Among ArchCare's programs is the ArchCare Advantage HMO Special Needs Plan ("ArchCare Advantage"). ArchCare Advantage is a health insurance plan which enrolls and provides benefits to Medicare beneficiaries who require nursing home levels of care.

26. ArchCare and Cabrini entered into an arrangement under which ArchCare would solicit Cabrini's Medicare patients to join ArchCare Advantage. On information and belief, the sources of which are conversations between Ms. Smith and Cabrini administrators, ArchCare pays Cabrini a fee for each Medicare resident enrolled in ArchCare Advantage.

27. ArchCare Advantage assigned a Nurse Practitioner ("ArchCare N.P.") to Cabrini to serve as the primary care provider for the Cabrini residents enrolled in ArchCare Advantage.

28. Cabrini administrators instructed Cabrini staff to consult with and defer to the ArchCare N.P. for all medical decisions relating to the ArchCare Advantage members at Cabrini.

29. On multiple occasions, ArchCare Advantage Members at Cabrini became seriously ill and needed to go to the hospital.

30. However, the ArchCare N.P. generally refused to approve the hospitalization of ArchCare Advantage members at Cabrini. On information and belief, the sources of which are Ms. Smith's conversations with Ms. Josephs, this was because ArchCare was financially advantaged when its members continued to receive care at Cabrini and disadvantaged when its members were hospitalized.

31. On several occasions, Ms. Smith determined that ArchCare Advantage members were seriously ill and needed to be hospitalized. When Ms. Smith contacted the ArchCare N.P., however, the N.P. declined to authorize the hospitalization. Believing that the residents' safety was endangered, Ms. Smith contacted the physician assigned to the Cabrini unit, who upon learning of the situation, ordered that the patient be hospitalized.

32. Ms. Smith was reprimanded by Ms. Josephs for going over the head of the ArchCare N.P.

33. Ms. Smith complained about the ArchCare N.P.'s failure to hospitalize critically up until the time of her termination.

**Ms. Smith Objects to the ArchCare N.P.'s Inappropriate use of Hydroxychloroquine.**

34. In April 2020, Ms. Smith learned that the ArchCare N.P. had prescribed Hydroxychloroquine to an ArchCare Advantage member at Cabrini who was symptomatic for COVID-19.

35. At a multidisciplinary staff meeting, Ms. Smith asked the ArchCare N.P. whether she had obtained a baseline EKG for the patient prior to prescribing Hydroxychloroquine. Obtaining a baseline is EKG is necessary because of the potential cardiac complications associated with Hydroxychloroquine.

36. The ArchCare N.P responded that she had not obtained a baseline E.K.G. Ms. Smith responded that she believed the ArchCare N.P. had acted unethically and unsafely.

37. The ArchCare N.P. appeared offended by Ms. Smith's response, and, on information and belief, complained to Ms. Josephs about Ms. Smith.

38. Several days later, Ms. Smith's employment was terminated by Ms. Josephs.

**FIRST CLAIM FOR RELIEF**
(Retaliation in Violation of Federal False Claims Act)

39. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

40.     Defendant retaliated against Plaintiff in violation of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. §3730(h), by terminating her employment in retaliation for her opposition to Defendant's submission of false claims to Medicare for reimbursement of nebulization procedures.

## SECOND CLAIM FOR RELIEF
(Retaliation in Violation of New York False Claims Act)

41.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

42.     Defendant retaliated against Plaintiff in violation of the anti-retaliation provisions of the New York False Claims Act, N.Y. Fin L. § 191, by terminating her employment in retaliation for her opposition to Defendant's submission of false claims to Medicaid for reimbursement of nebulization procedures.

## THIRD CLAIM FOR RELIEF
(Retaliation in Violation of N.Y. Labor Law § 741)

43.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

44.     Defendant retaliated against Plaintiff, who provides health care services, for her opposition to, and disclosure to a supervisor of, conduct constituting improper quality of patient care within the meaning of New York Labor Law § 741.

WHEREFORE, Plaintiff demands judgment:

1.     Reinstating Plaintiff's employment with Defendants and upon reinstatement, enjoining Defendant from retaliating against her for her complaints concerning

false claims or threats to patient safety, in the terms and conditions of her employment;

2. Awarding Plaintiff back pay, and on Plaintiff's False Claims Act claims two times the back pay;

3. Awarding Plaintiff special damages, including but not limited to damages for emotional distress;

4. Awarding reasonable attorneys' fees, costs, and expenses, and

Granting such other legal and equitable relief to the Plaintiff as the Court may deem just and equitable.

## JURY DEMAND

Plaintiff demands trial by jury of all issues as of right by a jury.

Dated:    New York, New York
          August 11, 2020

                                    GISKAN, SOLOTAROFF & ANDERSON LLP


                                    s/_____
                              By:   Jason L. Solotaroff
                                    Amy Robinson
                                    90 Broad Street, 10th Floor
                                    New York, New York 10004
                                    646-964-9640
                                    jsolotaroff@gslawny.com
                                    *ATTORNEYS FOR PLAINTIFF*